Page 21-1038 Cboe Futures Exchange, LLC Petitioner v. Securities and Exchange Commission Mr. Greenwalt for the Petitioner Ms. McKenzie for the Respondent Mr. Stansel for the Intervener Morning Council, Mr. Greenwalt, please proceed when you're ready. Thank you, Your Honor. May it please the Court, my name is Paul Greenwalt and I represent the Petitioner in this appeal, the Cboe Futures Exchange. This appeal really boils down to one issue, does the exemptive order, standing alone, satisfy the APA standard requiring that the Commission engage in reasoned decision-making? The answer to that question is no. Instead, the exemptive order is arbitrary and capricious for at least three reasons. First, the order does not provide a factual basis explaining why the SPICE product must be exempt from the definition of a security future in order to achieve the Commission's stated goals, which are fostering competition and lowering transaction costs. That failure alone is fatal under the Administrative Procedures Act. Second, the Commission failed to consider two important aspects of granting exemptive relief. The Commission found that the SPICE product is a security future, and as the panel knows from our briefs, if something is a security future, the regulators have determined that specialized disclosures must be provided to investors before they can trade that product. The Commission, however, did not address that issue at all. It didn't address whether the effect of granting exemptive relief would mean that investors would not be provided with specialized disclosures that both the Securities and Exchange Commission and the CFTC have endorsed and have said must be provided to investors. The Commission also failed to consider the fact that its order and the fact that it decided to proceed alone and not engage in joint action with the CFTC would lead to regulatory confusion. We have a situation here where the Securities and Exchange Commission has said the SPICE product is a securities future, full stop. And it made that determination despite the fact that MJETS, the exchange where the SPICE product is traded, urged that the product be viewed as a regular future. In other words, it did not agree with MJETS on that position. Mr. Greenwald, is there, I mean, do you believe that the SEC has the authority to exempt SPICEs without working jointly with the CFTC? Your Honor, I do. There is a statutory scheme of joint regulation for security futures, but there's also section 36 of the exchange, which I believe, despite Congress's intent, the security futures would be jointly regulated. I do think that allows the Securities and Exchange Commission to go it alone and to exempt products solely for the purposes of exchange. And so you think it's consistent with the act for both agencies to reach different conclusions about what is a security future? I do not. And for the SEC to separately exempt, you know, a security future from their rules? I do not think it's consistent with the statutory scheme for the agencies to reach different conclusions about how a product should be classified. I do think, though, again, under section 36, that the SEC does have the authority to exempt even a security future from certain Exchange Act requirements, if that answers Your Honor's question. So we have a situation here where the SEC has said these products are security futures. Can I just ask you, so you started out by saying, I think, that you have to look at the order alone? Yes, Your Honor. And the question is why? So suppose if the order alone gives an indication of what the explanation is, and then all you have to do is look at the underlying record materials and it's readily apparent what the only explanation could be as to why the exemptive order was issued. Does it make sense just to send it back for what everybody knows is going to happen? It might. But I'm just framing the question that way to get your answer on why is it that you would never look past the four corners of the order itself? Well, I think you have to, they have to at least give some indication of the rationale behind their decision. That is required by section 706 of the APA and this court's precedent. So I don't think it's sufficient to go back after the fact, as counsel has done in their rationales that aren't discussed in the order and say, you know, this is what the commission certainly had in mind. And what do you mean? What are the rationales that you say aren't discussed in the order at all? Well, for example, their briefs talk about tax treatment of this product. The exemptive order doesn't mention tax treatment whatsoever. And we think there's a real issue as to whether or not the SEC, by granting exemptive relief for the purposes of the Exchange Act, can change the tax treatment of this product. In fact, the section of the revenue code that the commission cites in its brief, section 1234B, essentially says, and this is 1234B subsection C, something is a security future if it meets the Exchange Act definition of a security future. The commission has said it does meet the Exchange Act definition of a security future. The next provision, D, says if something is a security future, it's taxed as a security future, not as a regulatory future. So that's an example of where we believe that counsel on appeal has created a rationale that is completely missing from the exemptive order. Well, suppose the SEC said that in its order. Suppose it said it did reference promoting competition. And then the next layer is, well, why does it promote competition? And it could be, well, it promotes competition because it creates a more equivalent tax treatment. And then there'd be a subsequent question that you're pointing out, which is, does it actually create a more equivalent tax treatment? Because maybe the IRS thinks that actually it's not, you can't do this, that it doesn't result in the same tax treatment because you've already denominated a securities future. That's a separate question. But suppose the SEC, in its order, did do the second part, which is to say, promote competition, it did say that. Why does it promote competition to equalize tax treatment? And it explains, we think it'll equalize tax treatment because even though we denominated a securities future, we think really the fact that we're doing the exemptive part of it kicks it back and makes it roughly equivalent to VIX. And then there'll be a separate question later if that's correct or not, I get that. But if they had done that second part, would that be enough to survive arbitrary and capricious review for this part of your account? I don't believe it would. I think the case law is clear, including the Susquehanna case, which we believe is squarely on point. It's not sufficient for us to speculate about what the agency might have done, or wishes it had done. No, but they didn't. I'm giving you a hypothetical where we're not speculating anymore, at least as to the rationale for thinking that it's promoting competition is that it would equalize tax treatment. I'm hypothesizing an order in which the order actually says the reason that we think promotion of competition would be promoted is that tax treatment would then be equalized. So that part of the explanation is actually in the order by hypothesis. I know it's not in there now, but by hypothesis it's in there. So why wouldn't that be enough? I think they would have to explain why, under Your Honor's hypothetical, that it would equalize tax treatment. And they would have to deal with the various statutory provisions that I just dealt with, or just explained to the court. And they would have to explain why they think they have the authority to alter the tax treatment under the Revenue Code. And we don't think they have that authority. Is there anything in the record that suggests that, you know, even if the SEC could do this, or that by creating this exemption it affects the tax treatment at the Spice Futures? Is there anything in the record? There are statements by MJECs referring to tax treatment and the need to equalize it, but there's nothing in the exemptive order. And they are just inclusory statements, even in MJECs' submissions. So there's no analysis there of the tax code or the Commission's authority to alter the tax code and affect the tax treatment. And again, by finding that these products, the Spice product, is a security future, we think that locks in the tax treatment under Section 1234B. Right, you think that, but just get it back to my hypothetical. So suppose they say, I just want to get to some point at which it would be enough, because there has to be some explanation that it would be enough as to the tax treatment, even if it turns out, maybe you disagree with this, even if it turns out that it's legally wrong, if they believe that it will equalize the tax treatment, or if they think it's likely to equalize the tax treatment, they'd be in the SEC, obviously. They create an order that says, I'd like to promote competition, the way to promote competition is to equalize things as much as possible. One of the key criteria is tax treatment, because there's a disequilibrium unless there's equivalent tax treatment. We think it would equalize tax treatment, here's how we analyze the provisions, it would actually equalize tax treatment in our view, that may turn out to be wrong, but that's our view. If they spell that out, then would that be enough as to this part of it? I think it would be enough as to this part, as if the appeal would be different, then we would contend, we would be arguing that they got it wrong, essentially. But here we have a different case, there's the absence of any analysis. So if they engage in the analysis and get it wrong, I agree, Robert, that is a different opinion. And in Judge Srinivasan's hypothetical, would that be then a contrary to law challenge that you would bring? I think it would be contrary. I see I'm out of time, so unless you have other questions, I'll sit down and reserve my time for rebuttal. Thank you. Thank you. Ms. McKenzie? Good morning, Your Honors. May it please the Court, Rachel McKenzie for the SEC. There's no dispute in this case that the classification of these products and how they trade, whether as a security feature or as a feature, carries competitive consequences. Twenty years ago, CBOE sought and obtained relief so that its own product, FIX Features, would trade as a regular feature rather than as a security feature. And the Commission set it up in this order for this Court to discern that it granted conditional and exemptive relief to MJACs to level the competitive playing field so that FIX Features... Ms. McKenzie, can you maybe just give me some background here? Why did the SEC and CFTC not coordinate as they did with the FIX Futures? What was the... I mean, there's a very strong directive from Congress for security features to be coordinated between the CFTC and the SEC, and that's in fact what happened with FIX Futures. So why did the SEC go it alone here? The agencies disagree on whether or not, under the statutory terms, this product is a feature or a security feature. They reached different conclusions about that. As they're permitted to do under the statute, the statute grants concurrent jurisdiction. It requires the agencies to coordinate in certain particular ways, for example, as in the FIX Order, if they're going to exclude an index from the definition of a narrow-based security... But the fact that Congress gave the same exact definition in both acts and strongly, in a number of provisions, required coordination, I mean, is it actually consistent with the act for the agencies to reach two different conclusions about whether the same product is a security feature? I mean, how does that help people who are buying this product or people who are running this product? I mean, how does that work? I think it is, Your Honor, because the Congress gave the agencies concurrent jurisdiction, it certainly didn't give the CFTC unilateral authority to decide whether something is a security or not, nor did it give the Commission unilateral authority. And essentially what happened here is the agencies pursued it consecutively rather than concurrently. But at the end of the day, they reached roughly the same conclusion, right? The Commission disagrees with the CFTC. It does think that this product meets the statutory definition of a security feature, but it also recognized that practically speaking, there are reasons why it is appropriate to treat this product the same way that you would treat fixed features, and that is that it trades fundamentally as a feature rather than as a security feature. I don't think the Commission in this case created regulatory confusion. I think it eliminated it. CFTC went through its process. It determined that this should trade as a feature. The Commission hadn't spoken at all, and then when it weighed in, said, we actually think that this is a security feature, but at the end of the day, we also think it should trade as a feature rather than as a security feature. So apart from the regulatory confusion part of it, although if you have a follow-up, I don't want to. To me, there's a threshold question, which is that the order links the public interest to fostering competition, in the words of the order, but then it doesn't say anything about how competition is fostered. It just doesn't. There's nothing in here to explain how competition is fostered. And I take it from the briefs, the argument is essentially, well, it's self-evident. Of course competition is important, and that we can probably take as a given, but how does this foster competition? And the briefs have an explanation about margins and taxes, and we'll focus on taxes because at least taxes are in the record. But there's not the link in the order to any of that. That just seems like a problem because it leaves somebody wondering what the agency's explanation is as to why the public interest is being served, and it's incumbent upon the agency to explain it. It might be easy for the agency to do, but the order just doesn't contain that explanation. A couple of reactions to that, Your Honor. First of all, I disagree with the premise that the order doesn't say anything that suggests that these classifications matter for competition. Specifically about the margin requirements, that actually is in the order. In Joint Appendix 4, the Commission specifically exempts MJECs from requirements for listing standards, including with respect to margin, because given that the order is going to allow it to trade as a future rather than as a security feature, it would be improper to hold them to the same listing standards for security features. So the margin piece is actually in there. Secondly, the order also at footnote 35 notes that the statute itself recognizes that these regulatory classifications matter for competitive purposes because the statutory definition of a narrow-based security index in Exchange Act Section 3855 includes a three-month brace period when an index is going to transition from broad to narrow-based, i.e., when a product is going to transition from being a future to a security feature. There's no dispute that this classification matters deeply to market participants and that matters in a way that affects how customers think. There's no doubt about that, but let's just focus on taxes because that's been a big part of this. Is there anything about taxes? Not in the order. It is in the record. It's in the record, right. So you have to, and particularly it's in, I don't know, I already said VIX when apparently I was supposed to say VIX, so I don't know how I display it, but it's in the intervener's record when they made the application to the Commission. But you can't look at the order and know that it has anything to do, that competition is fostered because it equalizes tax treatment in the view of the Commission. I agree with that, Your Honor. I don't think that that particular piece is necessary to be in the order for this order to survive arbitrariness review for this reason. The Commission focused on the ways in which these classifications are different and matter and that is consistent with the Commission's expertise and what it particularly has control over. So that's the listing standard and marginal. As Your Honor's colleague with Mr. Greenwald indicated, ultimately the question of tax treatment is for the IRS. The Commission's statement that they should trade as a future and not as a security future is a necessary condition for MGEX to get the tax treatment it would like. It may not be sufficient, but that doesn't undermine the fact that it is necessary. You have a lot of stuff in your brief about tax treatment and I think, right, and now it's sounding to me like none of that matters. It matters, Your Honor. It matters that it's in the record. The order says enough for this Court to discern the Commission's path, that it reached this conclusion because these regulatory classifications carry competitive significance. The order highlights one reason why that's true, that's the listener requirements, and this Court can turn to the record in judging the reasonableness of the Commission's decision and see another reason why that's true, and that's the tax treatment. Ms. McKenzie, how do the listing requirements relate to competitiveness? It seems like the real gist of making them competitive is the tax treatment. I mean, listing requirements don't necessarily affect the competitiveness for consumers. So I'm not sure how that gets you to, you know, how does that get the SEC to supporting its claim that this is necessary for competition? I see my red lights on. Can I answer your question? Yes. The listing requirements as to margin do matter to customers because what margin essentially means is the higher the margin requirement, the more a customer has to pay up front to take a position. But the main, I mean, the main competitive difference is the tax treatment. That's a significant competitive difference. Do you have a sense, how is the IRS treating, what sort of tax treatment has been given to these futures over the past, I guess, I don't know, year and a half, two years? I actually do not know that. My colleague who is going to be speaking for MGEX next might have a better sense of that because it's MGEX with customers that would be requesting that treatment. But you agree that the SEC cannot exempt securities futures for the purposes of the tax code? It can't reach a determination about their tax code. What the commission did in this case is what it's authorized to do, which is exempt for most purposes, this product from the definition of a security future and state that it is the commission's intention that this trade predominantly is not. But that also means that the commission believes that this is a security future and for some purposes regulates it as a security future. For some limited purposes. And you agree that the SEC cannot exempt these from the tax code because presumably the SEC doesn't have any exemptive authority over the tax code? Certainly agree with that, Your Honor. What we have the authority to do is exempt this product from a definition. And as my colleague for Mr. Greenwood, the tax code depends on how this product is defined. Well, but you've already said the CFTC can have its own definition. So presumably the IRS can have its own, you know, understanding of what a security future is. And I actually think the way the SEC has structured it is that the SEC believes it is a security future and then creates exemptions. But you've defined it as a security future. So it's hard to imagine then why it would also be exempted, why it would get the type of favorable tax treatment you're assuming that it will get in order to promote competition. Because the commission stated clearly in its order that the intent is for this product to trade as a security future and not a security future. I do just want to, if I may, briefly roll back to the issue of the CFTC and its determination. I think deciding that the commission couldn't come to a different conclusion creates some confusion. I think the CFTC went first. The situation that arises is that if the commission disagrees with the CFTC, as far as Steve-O's argument goes, that it only has two choices. It can either say, we agree with you that this is a future and cede all of its jurisdiction. Or it can say, we don't agree with you, this is a future. We think it's a security future, but then we can't grant any exemptive relief to allow these things to practically work. Of course, it's a big problem with independent agencies, right? Because if these agencies were under the control of the White House, then there would be some uniformity. It's not clear how two historically independent agencies are supposed to coordinate for the benefit of consumers and the public in a way that Congress has directed them to do. Your Honor, I do want to emphasize that the agencies do coordinate substantially. We did have discussions about this particular issue. In this particular case, we were not able to reach an agreement as to whether or not this was a future or a security future. But we worked it out. This is exactly the way government agencies should behave. We have a disagreement about what the statutory language means, but we came to a practical solution that's mutually agreeable to both the CFTC, SEC, and MJIC. CBO challenges that, but I think the practical result here is exactly what you would want to see. And you came together with VIX way back in the day, I guess, right? That's correct. More so than here, even though I take the point that the ultimate conclusion here, in your view, is more alignment than in disalignment. So on the tax part of it, if the SEC seems like you agree, the SEC can't dictate tax treatment by virtue of its classification, but it can predict tax treatment. That's essentially what's going on. It thinks that even if it classifies it as a securities future because of the exemptive part of it and because the goal is to treat it as a future, the assumption on the part of the SEC is that then it will gain futures tax treatment by virtue of how the IRS chooses to treat it. That's what's going on. That's right, Your Honor. I think it's a reasonable expectation that it will get this tax treatment. It's a necessary precondition to it getting that tax treatment. Whether or not it actually happens, we don't know, but we're not required to be able to perfectly... So is that the type of thing, it's not in the order? Is your view that the SEC, it would have been irresponsible for the SEC to put that in the order because it doesn't have authority? No, Your Honor. I don't think it would have been irresponsible for the SEC to do that. So it could have. It could have. Frankly, there's a practically limitless amount of detail that the commission could have put in this order. I think the question is what it's required to put in the order. Right. And so it could have done that. Yes. And it just didn't, there's not a word about tax treatment. That is correct. Yeah. Okay. Can I ask you, so the order does say in linking the statutory goal of public interest to the explanation for the exemption, it does say what it's going to do is foster competition. That's the way in which the public interest is furthered, I assume. Yes. So what if the order didn't say that either? It talks about the public interest, but it doesn't say anything about facilitating greater competition or foster competition. Would that be okay? Because someone could say, well, all you have to, everybody understands, of course, this is a competitive landscape. Just look at the history. Look at FICS. Everybody knows what's going on. Look at MDOT's application. That's obviously what's going on. The order didn't have to say that. Just assume it to be true because, of course, that's the backdrop against which the commission acted. So I think if your honor's hypothetical is essentially if this case, the commissioner just said the state under Section 36 does have to be in the public interest in case of investor protection. We find that this meets those, and so we're granting exemptive relief. And then we have some conditions. Right. Spell out all the conditions. I think that would be a lot closer to what this court was dealing with in Dixon and in Butte County and Taurus Records. It would be a much closer case than this one. But I think in this case, the commission did provide its rationale for why it made that ultimate finding that this was consistent with Section 36. And that's the foster competition. And that spikes futures would need to trade, clear, and settle as a futures contract rather than as a security future to serve as an alternative to the only comparable incumbent volatility product. Yes. And what if there was no reference to, I mean, you pointed out something about listing and margins. If there weren't that. It's a good question, Your Honor. I'm not sure that the commission is required to go deeper than this is necessary to foster competition. These things need to be comparable. So they need to have the same regulatory treatment. But this order does go that extra step and points out one way in which these different regular... That's the listing point. And it also, again, points to the fact that the CFMA itself in the Exchange Act indicates that these classifications matter deeply to market participants. If there are no further questions. Thank you, Your Honor. Thank you. Mr. Stancil. May it please the Court, Mark Stancil for intervener, which we call MJECs. Thank you. I'd like to address two primary points subject to the Court's questions. First, I'd like to explore this competition issue in a little more detail and explain why we believe that the commission's order and ultimate conclusion is rock solid, that this product, approving it to trade as a future, was absolutely essential to competition. And second, I'd like to spend just a minute on the practical reality of awarding any remedy here, but in particular, the vacancy remedy that Steve-O was seeking. So first, Your Honor, let me start by addressing competition. And I'd like to start maybe by pressing back on your premise that the order doesn't explain the basis for the competition finding. And part of the reason that it doesn't get a lot of discussion in the order is because not a lot of discussion is required. So Steve-O's primary attack in its brief is to try to redefine the market, to say, well, the market here is volatility in the S&P 500. Well, that's not correct, and that's not how the commission defined competition and the relevant market in its order. Here's what it said. The commission said, first, it defined MJX's request. Where are you reading from? This is page one. It's literally the first paragraph of the order. It says that MJX has asked, the request seeks permission for listing and trading contracts for sale for future delivery on the SPICE index. And then concludes that the product has the potential to offer competition with the only comparable product, only comparable incumbent volatility product on the market. So the commission defines the question as S&P volatility futures. And I'm going to spend just a second trying to explain the difference between futures and what Steve-O suggests would be other potential alternatives. It's apples to oranges. So Steve-O says that actually the question is just S&P index volatility generally and suggests ETFs, ETNs, options, things like that. In the financial world, which is a little esoteric, I grant you, those are like, that is like, you know, I use the focus analogy apples to oranges. It's like apples to celery to rutabaga. An option has a very different market dynamic. It's used by different investors. Futures, volatility futures are used by institutional investors and have a totally different risk profile. So until a few weeks ago or a few months ago, rather, I'm not sure I would have known the difference. But to people in the industry, this doesn't require explanation. And what is undisputed is that there is before the SPICE product, one product, one and only one that picks future in that market. And that's because they have an exclusive license from S&P. So, Mr. Stansley, even if we assume that competition is a real, you know, of real importance here, that that assumption of the SEC is correct. I mean, why does MJX not challenge the SEC's threshold determination that that the SPICE future is a securities future? Well, we did try to persuade them of that. The way, if you recall, what happened was we self-certified with the CFTC that this was just a future. The commission objected. We pulled the product and spent the better part of a year trying to persuade them. But they do have this exemptive authority. And I think my colleague is quite correct. The main reason that you cite in your brief for the need for the exemptive authority is the tax treatment. So, I'm curious. I mean, what has been the tax treatment over the past year plus? My understanding is that you're taxed as future. And I think that's consistent with the definition. I'm no tax lawyer, but I think it's consistent with the definition of 1256 contract. But I grant you something would have to give, and there's nothing in the statute that says that the commission can't exercise its exemptive authority to preserve its opinion that these ought to be futures, but to trade as futures contracts. So, when something trades as a futures contract, it goes to a specific kind of exchange regulated by the CFTC in the day-to-day. And so, that is my understanding of how these things are, in fact, treated in reality. And this exemptive authority has, in the real world, created the tax consequence that your client is seeking? Yes, that's my understanding. The reason, Your Honor, if I may continue just a moment, the reason that they don't have to go deeper into competition is because of we're really at day one of introducing any competition into the futures volatility market. So, it doesn't require a lot of explanation to say it is better to have two genuine competitors than one. That is why, with respect, I think it is self-evident. Right, but that part of it may be self-evident. But then there's the question of why does this make them genuine competitors? And that's because tax treatment, that's the main one. Well, respectfully, Your Honor, if it's a futures product and trades as a future, then it is a competitor. It would also require a... So, if you treat it as a security future, it will not trade on a futures exchange. So, they're literally... And CBOE cannot point to any. There is no such thing as a security future product for S&P volatility. The thing just doesn't exist for this reason. So, did the commission have explained that it has to trade as a future? They did. Do they have to go the next step and say, here are all the consequences of that? I don't think so. There is an additional point in the... Would that be helpful? Sure, it would be helpful. But I think, Your Honor, in the context of an informal adjudication, as the commission has explained, I don't think they're required. No, no, I don't think they have to do everything that's helpful. I just want to make sure I understand your argument that it actually would have been helpful to do that. Yes. But I would also point, Your Honor, to page three of the joint appendix, in which the commission also explains that adding second product, this is... I don't know if you all look at the first column on the left, eight or nine lines down. It says, in addition, the introduction of an additional volatility product in the market should lower transaction costs for market participants. That was a big part of the submission. May I spend 30 seconds on the remedy issue? If it's 30 seconds, yes. Thank you. I just want to explain how competition works when trying to dislodge a monopolist. So having an S&P volatility futures product is one step of a multi-step, multi-year process, and it is hard to dislodge an incumbent that's enjoyed an 18-year monopoly. So a remand, we think, is not necessary, but a vacature would be catastrophic. It wouldn't just set us back 30, 60, 90 days. It could set us back years with great injury to competition. And if Your Honors would just flip at some point to JA 87, which is in the SEAL appendix. The fact that there are consequences to vacate doesn't mean we don't just remand without vacate because it would be difficult for one of the parties. If we found that the order is arbitrary and capricious in some important way, then isn't the ordinary remedy to vacate? Ordinarily, yes, Your Honor, but not where doing so would actually undermine the purposes of the act itself and where the authority to vacate. That's not our standard, though, for remand without vacater. Correct, Your Honor. I think it would be entirely disruptive to the market. There are enormous reliance interests on not only our product, but on regulatory clarification of this area. So I think under the ordinary reliance factors, I think it would be incredibly disruptive. It would dislodge pricing improvements that have happened in the market. There are people who are relying on our product. There are products that, in turn, rely on our product. So we would be unscrambling a lot of eggs. I think that is in the core of why the court would win. Can you just practically spell out the reliance? I mean, that's because of the nature of the future, that it's, by definition, forward-looking so people have made transactions in reliance on the regulatory treatment as, although classified as a securities future, trading as a future. Absolutely, Your Honor. And it would undo those expectations. Yes. And so, for example, when this product first came on in 2019 and started to trade, it required, I think, all of somebody's Thanksgiving holiday to try to unwind even the first day of trading. And here we're talking about two years of product. But then also there are, I believe, ETFs that incorporate the spike volatility future product in that ETF. So it's not just our product. It's products that are derivative of this. Yes. Derivative of a derivative. If the court has no further questions. Thank you, Mr. Stansel. Mr. Greenwald, we'll give you two minutes for rebuttal. I'd reserve three, but. I think you'd used up some of that already. A few points, Judge. First, there was mention by Ms. McKenzie of agreement between the agencies to disagree. There is nothing about an agreement between the agencies or discussions between the SEC and the CFTC in the record in terms of what the CFTC's position is. And the CFTC has not stated a position as to whether or not this product is a regular future or a security future. There was also a lot of discussion by both Ms. McKenzie and Mr. Stansel about competitive facts and competitive analysis. And I'd just like to remind the panel, again, there is no competitive analysis in the exemptive order itself. There's no definition of the competitive market. Counsel and I may disagree about what the competitive market should be defined as, but the reality is the exemptive order says absolutely nothing about that issue. And, in fact, it doesn't even refer to the VIX futures by name. With regard to the tax treatment, Ms. McKenzie conceded, I think, correctly that the SEC can't determine tax treatment. But their briefs are all about tax treatment. And then their argument turns into, well, don't look at the order, you know, look at the record on tax treatment. And that argument is directly contrary to the Supreme Court's holding in the state farm case, the Motor Vehicle Association case, where the court said you can't look beyond what the agency has said to the record and come up with justifications to support the agency action. And finally, with regard to the vacater versus remand remedy point, again, there is no evidence of a catastrophic market effect that would occur if the exemptive order were vacated. In fact, the evidence is directly contrary. In 2019, MJEC shut the product down on one day's notice when the SEC presumably said, what are you doing? We think this is a security future. Why are you trading it as a remand? So there is no evidence of a catastrophic market. But how long had it been happening at that time? It had been trading for two weeks. But remember, these are futures, Your Honor, so they trade to expiration. Contracts continually expire. And although it's outside the record as well, and I'm leery about going outside the record, there is not a significant open interest historically in the SPICE product. It's not something that is heavily traded. So for this part of the inquiry, I think almost by nature we have to go outside the record to some extent because no one's going to have created a record that's geared towards the question of vacater, I don't think. So what would be the practical consequence of a vacater in your view? You think it would be – there would have to be transitions that would have to be unwound, I take it. Everybody agrees on that. Well, they would have to close their positions out. They would not be able to open any new positions, and they'd have to close their existing positions out, which is exactly presumably what happened in 2019 in one day. The record is that the SEC asked Amjects to stop trading on November, I think, 28th, and they stopped trading on November 20th. So, again, the idea that they should continue trading pursuant to an exemptive order that is invalid because of some catastrophic market effect, there's just no evidence of that. All right. Thank you, counsel. Thank you to all counsel. We'll take this case under submission.
judges: Srinivasan, Wilkins, Rao